# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES DAVIS. # 317-735 | * | |
| Plaintiff | * | |
| | * | |
| v | * | Civil Action No. JKB-12-2051 |
| | * | |
| CORIZON MEDICAL SERVICES, formerly known as Correctional Medical Services, et al. | * * * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM

This is an action under 42 U.S.C. § 1983 filed by James Davis ("Davis") against Corizon Medical Services, f/k/a Correctional Medical Services, Kathleen Green, Warden of Eastern Correctional Institution, P.A. Terry, P.A. Bruce,[1] Officer Fritz, Lieutenant Soukup, "John Doe," and Lynn Coie,[2] alleging defendants violated his Eighth Amendment rights.[3] Warden Green, by her counsel, has filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment with declarations and Davis's prison records. ECF No. 27.[4] Defendants Corizon, Inc., f/k/a Correctional Medical Services, Inc., Bruce Ford, P.A., Terri Pilcher, P.A and Lynne Cole, Regional Director of Corizon, Inc. (collectively referred to as "the Medical Defendants"), by counsel have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

---

[1] Davis incorrectly identifies defendant as "P.A. Terry." Defendant's name is Terri Pilcher. ECF No. 32 at 1. Defendants identify "P.A. Bruce" as Bruce Ford. The docket will be corrected.

[2] The name of defendant "Lynn Coie" will be corrected on the docket as "Lynne Cole."

[3] Service was not obtained on "John Doe," Officer Fritz, or Lieutenant Soukup. Even if these individuals had been served, Davis's factual allegations fail to suggest these defendants acted with requisite deliberate indifference to state an Eighth Amendment claim. *See infra*, pp. 3, 5-6.

[4] At the direction of the court, the response also addresses Davis's claim that his initial partial filing fee under the Prisoner Litigation Reform Act of 1996 was improperly calculated to include funds in his prison reserve account. ECF Nos. 7, 16, and 27, Exhibit 1 and 2. After reviewing the response, the court is satisfied Davis's partial payment fees have thus far been properly assessed. Davis's dispute regarding payment of the filing fee does not allege any facts against Warden Green and does not state a claim against her.

with declarations and copies of Davis's medical records. ECF No. 14. Davis has filed oppositions with declarations.[5] ECF Nos. 26, 34 and 35. A reply to Davis's opposition was filed by the Medical Defendants. ECF No. 32. After reviewing the record, the court finds a hearing is unnecessary to resolve the issues. *See* Local Rule 105.6 (D. Md. 2011).[6] Defendants' motions, treated as motions for summary judgment, will be granted.

## BACKGROUND

Davis, an inmate at Eastern Correctional Institution ("ECI"), suffered a seizure in his sleep early in the morning of February 9, 2010, and fell "five feet" from his top bunk bed to the cell floor and lost consciousness. ECF No. 1 at 4-5. His cell mate alerted corrections staff and Davis was sent to the Peninsula Regional Medical Center emergency department for observation and treatment. Davis states that when he awoke in the hospital he was in "excruciating pain" in his "lower right side of back and head." ECF No. 1, p. 4. Several hours later, he was escorted to the ECI infirmary where he was placed on bed rest and for monitoring. Later that day, he was returned to his cell and, he claims, to his top bunk bed. Davis avers he then slept with his mattress on the floor for one week before prison and medical staff assigned him to a bottom bunk.

Davis, who entered ECI in 2008, claims he had a "permanent bottom bunk indefinite order in since 1.12.04" and faults defendants for failing to comply with this allegedly long-standing order. He has submitted a copy of a medical assignment form signed on July 28, 2005, which reads "bottom bunk indefinitely Seizure Disorder." ECF No. 26, Exhibit 13.[7] He claims

---

[5] Davis has submitted declarations from two inmates attesting to the fact of his seizure and fall from his bed to the floor on February 9, 2010. ECF No. 26.

[6] Davis also filed a "Motion for Default Judgment" (ECF No. 37) which will be denied for lack of merit.

[7] The order was written by a medical provider at another institution prior to Davis's admission to ECI in 2008. Prison files contain no record of the administrative remedy request or sick call slip Davis allegedly submitted upon

he submitted a "request slip" and a sick call slip one week after he was first assigned to ECI to notify prison and medical personnel of his permanent top bunk designation. ECF No. 1, at 11. Davis avers he told Officer Fritz about the order and was instructed to tell Lieutenant Soukup. *See id*. at 5. According to Davis, Soukup informed him that several inmates were already waiting for a bottom bunk, and Davis would be assigned to one as soon as space became available. Davis claims Terri Pilcher, P.A., told him she would complete the paper work for his bottom bunk placement, but never did so. *See id*. Davis has not submitted a declaration attesting to the above allegations.

After his accident, Davis submitted several sick call slips before medical providers "followed up" on his injuries. *See id*. at 7. He contends "P.A. Bruce" examined him and "continued to string [him] along" in regard to ordering physical therapy and a steroid shot for pain relief. *See id*. Specifically, Davis submitted the sick call request forms on the following dates: 1) December 20, 2010, he asked to see a doctor about right hip pain;[8] 2) January 10, 2011, he complained of right hip complications and asked for a "full body physical" and a bone density test; 3) March 21, 2011, he complained of "unbearable" hip pain and mobility problems; 4) March 29, 2011, he complained of "tremendous" hip pain and stated "I'm still waiting for the steroid shot for my hip"; 5) July 10, 2011, he stated he was still having pain in his right hip. "I still need a full body physical and testing on everything."; 6) August 12, 2011, on a request form with the name "Lynn Cole" written at the top, Davis wrote: "I've written to you about 2 months ago about problems I been [sic] having of not being seen or treated by two different nurses and told I would be put in to be seen by P.A…"; 7) September 20, 2011, Davis complained he had

---

his arrival at ECI. ECF No. 27, Exhibit 5. Davis has not submitted a copy of the referenced "permanent bottom bunk indefinite order in since 1.12.04," nor does he aver that he gave a copy of the order to corrections officials or medical providers at ECI for their files.

[8] The sick call requests also contained complaints about chest pain, skin lesions, broken eyeglasses, and headaches.

3

not received a steroid shot in his right hip for pain relief and complained this was the third time he was writing concerning this matter; 8) October 22, 2011, he complained of hip pain; and 9) November 2, 2011, he complained of hip pain. ECF No. 26, Attachments.

On February 28, 2010, Davis filed an Administrative Remedy Procedure request ("ARP"), complaining his fall on February 9, 2010, was a result of medical providers' "reckless disregard." ECF No. 1, Exhibit 1. On March 29, 2010, Warden Green responded:

> Your request for administrative remedy has been investigated and is Meritorious in Part; you were not assigned to a bottom bunk on arrival, however, there are no sick-call slips present in your record to indicate that you requested or communicated to medical that you were on a top bunk. You have been since ordered a bottom bunk and proper paper work forwarded. You were seen appropriately following your discharge from the hospital. Providers are reminded that transfers to the facility with seizure disorder [sic] should have an order written for bottom bunk.

*Id*.

Davis faults Defendants for failing to assign him to a bottom bunk when he first entered ECI, and failing to administer proper follow-up medical care after he fell. He argues these actions constitute deliberate indifference to his medical needs in violation of his rights under the Eighth Amendment. As relief, he requests monetary damages, examination by a "qualified physician," and physical therapy. *Id*. at 10.

## STANDARD OF REVIEW

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." This does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting then-Rule 56(e)). A court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Medical Center, Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002). A court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## DISCUSSION

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, plaintiff must demonstrate the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer,* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris* 240 F.3d 383 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)). Further, "[d]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citation omitted). Disagreement over the course of treatment does not provide the framework for a federal civil rights complaint, *see Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975), and mere negligence or malpractice does not rise to a constitutional level, *see id. at* 319; *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986).

### A. Warden Green

Warden Green has submitted a declaration in which she attests she does not issue medical orders or interfere in medical treatment. ECF No. 27, Exhibit 7. She has also submitted the Declaration of Sergeant James Balderson, Litigation Coordinator at ECI, in which he attests he was unable to find any ARP or other request by Davis for a bottom bunk prior to his ARP dated February 28, 2010, which was submitted after Davis fell. Exhibit 4; Exhibit 5. Green asserts that immediately after the incident, medical staff issued a lower bunk order for Davis. Exhibit 4, ARP, ECF 14, Exhibit 3 at 20-22.[9] Medical providers were also reminded that "transferred inmates with seizure disorders should have an order written for bottom bunk." ECF No. 27, Exhibit 3 and Exhibit 4 at 1.

#### 1. Respondeat Superior

Davis does not allege Warden Green was personally involved or that her actions or omissions caused the incidents at issue. Instead, he generally avers she is responsible for the safety and welfare of inmates at ECI. ECF No. 1 at 3.

A defendant must have been personally involved in the alleged unconstitutional action or omission to act in order to be liable in a § 1983 action. *See West v. Atkins*, 815 F.2d 993 (4th Cir. 1987). A defendant in a § 1983 action may not be held liable based upon the theory of respondeat superior.[10] *See Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994); *see also Rizzo v. Goode,* 423 U.S. 362, 370-71 (1976).

---

[9] Green asserts Davis was assigned to a bottom bunk on February 9, 2010, the same day he fell. ECF No. 27 at 2. Davis's Traffic History Record shows that on February 9, 2010, he was reassigned from bed B to bed A in his cell, presumably indicating a switch from the top to the lower bunk. ECF No. 27, Exhibit 3. Davis claims one week passed while he slept on a mattress on the floor until he was assigned to a lower bunk. The disagreement about the date is inconsequential. Upon notice of Davis's needs, prison officials acted quickly to secure a bottom bunk for him. Even if one week passed before Davis was placed on a bottom bunk, nothing suggests the delay was intentional or caused Davis further injury.

[10] Respondeat superior is a legal doctrine whereby an employer may be held responsible for his or her employees.

Instead, supervisory liability is "determined 'by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Shaw*, 13 F.3d at 798 (quoting *Slakan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence 1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; 2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and 3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw*, 13 F.3d at 799. Davis's allegations fail to satisfy this standard. There is no allegation or evidence to show Green was aware of Davis's medical need for bottom bunk assignment.

Even were Green not entitled to summary judgment for the above reasons, as a non-medical supervisory prison official, Green was entitled to rely on the medical judgment and expertise of prison physicians and medical staff concerning the course of treatment necessary for inmates. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir.1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel). Davis does not allege Green interfered with the decisions of medical providers or interfered with his bed assignment based on his medical needs. Accordingly, Green is entitled to summary judgment in her favor.

### B. Medical Defendants

#### 1. Corizon

The court takes notice that Corizon, Inc., is a private corporation that has in the past contracted with the State of Maryland to provide medical services to inmates at certain state institutions, administering medical care through its agents and employees. As earlier noted, the doctrine of respondeat superior does not apply in § 1983 cases. To the extent the complaint names Corizon based upon vicarious liability, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

#### 2. Lynne Cole

Davis seeks to hold Lynne Cole culpable because she "is the medical administrator at E.C.I. and is generally responsible for ensuring provisions of medical care to prisoners and specifically for scheduling medical appointments outside the prison when a prisoner need [sic] specialized treatment." ECF No. 1 at 3. The complaint neither alleges nor presents specific factual claims that Cole was personally involved in the denial of Davis's treatment or hindered his access to medical appointments. Davis fails to allege facts sufficient to demonstrate any personal or supervisory wrongdoing by Cole, and she is entitled to summary judgment in her favor as a matter of law. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691–94 (1978) (respondeat superior does not apply in § 1983 proceedings).

#### 3. Terri Pilcher

According to his medical records, Terri Pilcher did not treat Davis on February 9, 2010, or anytime thereafter. Since the records submitted start on February 9, 2010, they shed no light

as to whether Pilcher met with Davis soon after he entered ECI in 2008, when Davis allegedly told her about his bottom bunk order. Even if Davis's allegation that Pilcher told him sometime after he entered ECI that she would complete paperwork for him were true, however, his allegation fails to show Pilcher acted with requisite deliberate indifference to his serious medical need. He neither alleges nor provides factual predicate to suggest Pilcher acted with deliberate indifference by intentionally failing to submit a bottom bunk order with the awareness that such action would engender harm to him. Perhaps failure to complete the paperwork as alleged might be considered negligent, but mere negligence or malpractice does not amount to a violation of constitutional magnitude.[11] *See supra* p. 6. Accordingly, summary judgment will be entered in favor of Pilcher.

### 4. Bruce Ford

Bruce Ford treated Davis on February 11, 2010; June 1, 2010; July 8, 2010; September 16, 2010; January 28, 2011; April 13, 2011; October 4, 2011; December 13, 2011; December 29, 2011; February 24, 2012; and May 25, 2012. ECF No. 14, Exhibits 23-24, 45-46, 47-48, 52, 60-61, 69-70, 85-86, 93-94, 95-98, 101, and 109. On other dates, different medical providers, none of whom are named as defendants, treated Davis. Review of the records fails to substantiate a claim of Eighth Amendment violation against Ford. The record does not show Ford intentionally denied Davis a steroid injection, improperly hindered or delayed his medical care, or otherwise acted with deliberate indifference to his serious medical needs.

The record shows Davis has a history of seizures and is prescribed Dilantin to control his condition. ECF No. 14, Exhibits 20-12. After Davis fell from his bunk on February 9, 2010, he was hospitalized and evaluated. His tests showed full range of motion in his extremities, and no blurred vision, or loss of memory. ECF No. 14 at 4-5. He reported having a headache. *See id*.

---

[11] This court expresses no opinion as to whether the claims state a colorable state cause of action.

X-rays of Plaintiff's hips did not reveal any fracture. ECF 14, Exhibit 11. CT scans of his head and spine also showed no abnormal findings. *See id*. Davis informed hospital staff that he was "feeling better," and he was discharged with Tylenol-codeine and with instructions to take Motrin or Advil if needed, to apply ice to his sore muscles, and follow certain back exercises to help treat and prevent back injuries. ECF No. 14, Exhibits 11, 12-15.

Davis returned to the ECI and was admitted to the prison infirmary the same day where he was treated by David M. Mathis, M.D. ("Mathis"). ECF No. 14, Exhibit 19. In the infirmary, Davis was advised that the exams performed to his spine, hip, and head did not reveal any damage. ECF No. 14 at 20. It was noted that Plaintiff was fully oriented. *See id*. His records showed "right flank tender, but w/o hematoma. Walks w/ a limp." *Id*. According to the records, Davis acknowledged lack of compliance with his prescribed medication regime by throwing away part of his seizure medication. ECF No. 14, Exhibits 20-12. Davis, however, disputes that he has been noncompliant. ECF No. 34 at 4. Mathis ordered Davis housed in a bottom bunk for two years. ECF No. 14, Exhibits 20 and 22.

Davis received treatment for his medical concerns regularly after his fall for his complaints of related pain as well as other medical concerns including his seizure disorder. ECF No. 14, Exhibits 1-113. Davis was seen on February 11, 2010, two days from the date of his fall when he complained of hip and back pain. ECF No. 14, Exhibits 23-24. His x-rays and CT scans revealed no abnormalities. *See id*. He was prescribed Motrin (ibuprofen) for pain relief. *See id*.

On February 18, 2010, Davis was seen in the Chronic Care Clinic ("CCC") to monitor his seizure disorder and he complained of hip pain. ECF No. 14, Exhibit 25. The medical chart indicates Davis as "doing good today." ECF No. 14, Exhibits 26. His extremities were normal

11

and his condition was reported as "improving." *Id*. at 27. It was noted that he ambulated independently. *See id*.

Davis was treated next on February 28, 2010, by Lino Quilo, M.D., for hip pain and "chest bumps." ECF No. 14, Exhibits 29-30. Davis reported the ibuprofen provided ineffective pain relief and requested an injection to his hip. Most importantly, the record does not indicate the injection was indicated or ordered by the medical provider.

On April 5, 2010, he reported the pain in his hip "waxes" and "wanes" and increases when he crosses his leg. ECF No. 14, Exhibit 31. Plaintiff was advised to continue taking ibuprofen and x-rays were ordered. ECF No. 14, Exhibits 31-32. The x-rays, taken on April 5, 2010, revealed no dislocation or fracture. ECF No. 14, Exhibit 32.

On April 11, 2010, Davis was seen for abdominal pain and continuing right hip and back pain. He indicated ibuprofen provided ineffective pain relief. ECF No. 14, Exhibits 33-34.

On several occasions, Davis was seen by medical providers where he expressed no complaints of hip or back pain or concerns related to his fall. On April 28, 2010, Davis was seen by medical providers for a complaint of abscesses on his chest. ECF No. 14, Exhibits 35-36. On May 5, 2010, Davis was examined in the Chronic Care Clinic for treatment of his epilepsy. His condition was noted as stable and he ambulated independently. ECF No. 14, Exhibits 37-39. On May 22 and 23, Davis was seen for complaints of abdominal discomfort. ECF No. 14, Exhibits 39-41. On May 25, 2010, he complained of chest pain and walked out of the medical unit without waiting to be examined. ECF No. 14, Exhibits 42.

On May 27, 2010, Davis refused to take his Dilantin, stating his "hiatal hernia" made it impossible for him to swallow the capsules. Subsequently, Davis was convinced to take his medication. ECF No. 14, Exhibits 43-44.

On June 1, 2010, Davis voiced complaints of abdominal pain. He did not report any hip pain. ECF No. 14, Exhibits 45-46.

On July 8, 2010, Davis was seen for complaints of left hip pain. ECF No. 14, Exhibits 47. The medical chart reads, "Left hip aches, severity is moderate, duration is 6 month(s), associated with stiffness, worse with walking, improved by rest, status is stable." *Id*. Davis was prescribed Naprosyn, an anti-inflammatory medication, to alleviate his pain and was referred to the medical doctor for further evaluation. *See id*.

On August 3, 2010, Davis reported right hip pain. No swelling, pain, or redness was apparent, although some tenderness was found. The pain did not involve the hip joint. It was noted that Davis ambulated without difficulty. He was also seen the same day at the Chronic Care Clinic to monitor his seizure disorder. ECF No. 14, Exhibits 49-51.

On September 16, 2010, Davis asked medical providers to allow him to keep a back brace. The Medical Defendants state the back brace was unrelated to the matters presented in this case. ECF No. 14 at 14. Davis did not report experiencing hip pain during the visit. ECF No. 14, 52-53.

The medical records from Davis's November 10, 2010, appointment in the CCC noted he had experienced no "recent seizure activity." ECF No. 14, Exhibits 54-56. Davis indicated he "feels fine" and voiced "no questions or concerns relating to health care." *Id*. at 54.

On December 24, 2010, Davis presented complaints of abdominal discomfort, shoulder pain, and right hip pain. He was scheduled by the nurse to see a medical provider. ECF No. 14, Exhibits 57-58.

Davis was reported noncompliant with his seizure medication on January 15, 2011. ECF No. 14, Exhibit 59. On January 28, 2011, Davis reported pain in his chest and shoulder. ECF

No. 14, Exhibits 60-61. On February 15, 2011, he reported a skin irritation to his chest and was seen in the CCC. ECF No. 14, Exhibits 62-64. The medical record indicates Davis had not experienced any recent seizures. *See id.*

Davis did not complain of hip pain again until April 5, 2011, when he reported pain in his right hip and again requested a steroid injection. ECF No. 14, Exhibit 67. The medical record does not show a steroid injection was determined necessary or ordered by the provider.

On April 13, 2011, Ford entered the following entry on Davis's medical chart. It reads Davis "indicated that he was supposed to get a cortisone injection?" ECF No. 14, Exhibits 69-70. Again, there is no record an injection was ordered or determined necessary to treat Davis's hip pain.

On June 27, 2011, Davis was seen in the CCC, where it was found that he had not had a seizure since the date of his fall. He did not report hip pain. ECF No. 14, Exhibits 74-75.

On July 16, 2011, Davis complained of numbness and occasional tingling when lying on his left side. ECF No. 14, Exhibits 77-78. He was instructed to use "warm and cold compressors," to "position his legs with use of pillows when lying down," and to "use…muscle rub and Advil from the commissary." *Id.* at 77. The chart indicates he was to be scheduled with a provider to discuss his pain and decrease in range of motion to his right hip.

At his next medical appointment on September 24, 2011, Davis again complained his right hip was painful. ECF No. 14, Exhibits 79-80. Davis denied following medical recommendations to try a muscle rub, hot or cold compresses, or Advil. *See id.*

On October 4, 2011, Davis requested a cortisone injection. ECF No. 14, Exhibits 85-86. He was advised that he would be referred to a physician in order for this determination to be made. On November 3, 2011, Davis was examined by Paul Matera, M.D. The medical entry

states Davis was able to engage in physical activities without difficulty and his complaints of pain were intermittent. ECF No. 14, Exhibits 88-89. Davis's coordination and gait were normal and only a slight decrease in range of motion in his hip was observed. *See id*. Davis was prescribed Robaxin, a medication used to relieve discomfort associated with acute, painful musculoskeletal conditions. *See id*.[12]

On December 13, 2011, Davis was seen for an unrelated medical complaint. He did not report any hip pain. ECF No. 14, Exhibit 92. On December 15, 2011, Davis was seen in the CCC, and it was noted that he had not suffered a seizure for more than eighteen months. His bottom bunk order was renewed for one year. ECF No. 14, Exhibits 93-94.

At his physical examination on December 29, 2011, Davis had no deformities, pain, swelling, or weakness in either of his hips. ECF No. 14, Exhibits 97. Both hips demonstrated full range of motion. ECF No. 14, Exhibit 97.

On January 5, 2012, Davis was seen for a rash, an unrelated medical issue, and did not report hip pain. ECF No. 14, Exhibit 97. He was seen by medical providers February 24, 2012, for an unrelated medical concern and did not express any complaints of hip pain. ECF No. 14, Exhibit 101.

The record of Davis's March 14, 2012, appointment in the CCC indicates he had suffered a seizure "4 or 5 months ago, patient did not go to the infirmary for this. IM [inmate] needs bottom bunk orders. IM comes up for Dilantin and has labs from 10/24/11." ECF No 14, Exhibits 102-103. It was noted Davis's "last recorded seizures activities was grater [sic] than one year, meds renewed." He was continued on his medication regimen. ECF No. 14, Exhibit 103.

---

[12] *See* http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=c0975b4b-73b4-4292-b50f-ff3b925c8577

On March 29, 2012, Dr. Matera examined Davis for complaint of a rash, hip pain, and headaches. It was noted that Davis presented chronic "sprains and strains of hip and thigh." ECF No. 14, Exhibits 105-106. Davis told medical providers that he was able to work in the kitchen without difficulty. ECF No. 14, Exhibit 105. Davis reported that Naproxen helped reduce his pain from a "5-6/10 down to 2-3/10" and reported playing sports. *Id*. His coordination and gait were normal. It was noted that there was "no indication at present for further eval [sic] or" treatment in regard to his hip pain, and Davis was continued on his medications. *Id*.

On May 8, 2012, Davis was seen for increasing pain in his right hip. At this visit, he stated Naproxen was ineffective for alleviating his hip pain. Exhibit 14, Exhibits 107-108. He was referred to his medical provider.

At a medical visit on May 25, 2012, it was noted that when Davis was seen by Dr. Matera, Davis had "been doing well with naproxen [sic]" and advised to continue the current treatment. ECF No. 14, Exhibit 109. Davis's gait was reported normal and he was "sitting and rising from a chair with no difficulty." *Id*.

On June 27, 2012, Davis was treated for allergies and voiced no complaints of hip pain. ECF No. 14, Exhibits 111-113. No recent seizures were noted and tests of his Dilantin levels were ordered. *See id*. The record noted Davis needed a bottom bunk order. Davis filed the instant complaint on July 6, 2012. ECF No. 1.

Clearly, the complaint reflects Davis's frustration with his symptoms, but allegations predicated on a self-diagnosed need for a steroid injection and unspecific tests amount to disagreements between an inmate and a physician over care and do not state a claim of constitutional dimension. In so finding, the court does not minimize Davis's frustration or his

16

condition; however, the evidence is insufficient to find deliberate indifference. Davis was provided continuing care for his reports of hip pain. Accordingly, Ford is entitled to summary judgment in his favor as a matter of law.

## CONCLUSION

For these reasons, the Motions for Summary Judgment filed by Warden Green and the Medical Defendants will be granted. Davis's two Motions to Oppose Summary Judgment will be denied. Judgment will be entered in favor of the defendants by separate Order to follow.

| | |
|---|---|
| August 21, 2013 | /s/ |
| Date | James K. Bredar |
| | United States District Judge |